IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON

_____

**BOB T. SOUDER, Individually**
**and on behalf of all others similarly**
**situated,**

     Plaintiffs-Appellees,

Vs.

**HEALTH PARTNERS, INC.,**

     Defendant-Appellant.



F ILED

October 27, 1998

Cecil Crowson, Jr.
Appellate Court Clerk

Madison Chancery No. 53326
C.A. No. 02A01-9712-CH-00321

_____

FROM THE MADISON COUNTY CHANCERY COURT
THE HONORABLE JOE C. MORRIS, CHANCELLOR

William H. West; Stokes & Bartholomew of Nashville
William H. Shackelford of Jackson
For Appellees

Robert B. Littleton, Mary Ellen Morris; Trabue,
Sturdivant & DeWitt of Nashville
For Appellant

*AFFIRMED AS MODIFIED*

Opinion filed:

**W. FRANK CRAWFORD,**
**PRESIDING JUDGE, W.S.**

**CONCUR:**

**ALAN E. HIGHERS, JUDGE**

**HERSCHEL P. FRANKS, JUDGE**

This case involves a contract arbitration clause and the Tennessee Open Meetings Act

(Act). Defendant, Health Partners, Inc. (HP), appeals the Chancellor's order denying its motion

to compel arbitration and granting the Plaintiff's, Dr. Bob T. Souder, M.D. (Souder), motion for

judgment on the pleadings.

HP is a Preferred Provider Organization (PPO) that contracts with insurance companies and employers from Tennessee and other states. HP provides contracting third-party payors with a network of physicians. HP was created in 1994 under the authority of the Jackson-Madison County General Hospital District (District) as a "governmental instrumentality" of the District. The District created HP in order to further the District's mission to provide the full range of health care and allied and incidental services.[1] HP is a not-for-profit mutual benefit corporation which has, as its sole member, the District.

In 1994, Souder entered into a Physician Participation Agreement (PPA) with HP. In late 1996, Souder and other physicians who were participating medical providers in HP's PPO received a letter[2] dated November 26, 1996 from HP which stated in part as follows:

> The Board of Directors of Health Partners recently approved
>
> actions which offer an exclusive provider relationship to West
>
> Tennessee Alliance for Healthcare (WTAH), a Physician Hospital
>
> Organization (PHO), and the Jackson Clinic to serve as the sole
>
> physician networks, for services they render, in Madison County.
>
> . . .
>
> * * *
>
> It is our understanding that you are not currently a member of
>
> WTAH. Because of the above described decision, we are hereby
>
> notifying you that your existing contract with Health Partners will
>
> not be renewed.[3]

The action of the Board of Directors of HP described in the above-quoted letter did not take place at a board meeting, but instead took place in the form of a written consent resolution

---

[1] According to HP's charter, its purpose is to "further . . . the statutory mission of the Jackson-Madison County General Hospital District to make health care available to the public."

[2] This letter was sent to Souder and the others by Joseph McGuire (McGuire), the Interim Director of Operations of HP.

[3] Souder's contract was due to expire on February 1, 1997.

in lieu of a meeting.[4] On January 9, 1997, the Board of Directors of HP adopted a resolution in which it restated its previously adopted policy of limiting HP's physician provider network in Madison County. This meeting took place without prior public notice as had all previous meetings of the Board of Directors of HP.

Subsequently, Souder and the other physicians received a letter from McGuire dated January 31, 1997, which stated as follows:

> You previously received from us a letter dated November 26, 1996, advising that your Physician Participation Agreement with Health Partners, Inc. would not be renewed. We understand there may be some misunderstanding as to the effect of the notice of nonrenewal. In order to clarify any confusion that may exist, and to assure an orderly transition, this letter is notice, pursuant to Section 9.2 of the Physician Participation Agreement, that the agreement is terminated. The effective date of the termination of your Physician Participation Agreement is sixty (60) days from the date of this letter, April 1, 1997. Until this date, you will remain a participating provider in Health Partners, Inc.

On July 29, 1997, the Board of Trustees of the District amended HP's charter making the Board of Trustees of the District the Board of Trustees of HP. This meeting was announced to the public and open to such.[5] In addition to amending HP's charter, the Board of Trustees of the District ratified and confirmed all actions of the previous Board of Directors of HP and the management of HP.

In May 1997, Souder filed this suit seeking reinstatement of his PPA with HP alleging that the actions of HP violated the Act. Souder alleges that the Act is applicable to the Board of Directors of HP in that it is an entity that falls within the provisions of the Act. Furthermore, Souder avers that the action of the Board of Directors of HP to limit its network, thereby excluding himself and other similarly situated physician providers, was taken at meetings without the required public notice. Souder alleges that all actions taken by the Board of Directors of HP are void and of no effect since none of its meetings have been open to the public pursuant to the Act.

HP filed a motion to compel Souder to submit the case to arbitration as required by the PPA. This motion and a subsequent motion to reconsider were denied by the Chancellor. After

---

[4] The board meeting which was originally called on July 29, 1996 to review this issue failed to produce a quorum.

[5] The District is, as a matter of law, subject to the requirements of the Act.

3

HP's answer was filed, Souder filed a motion for judgment on the pleadings with regard to the applicability of the Act to HP and the possible violations of the Act by HP.

The Chancellor granted Souder's motion. The Chancellor concluded that HP was subject to the coverage and requirements of the Act because of its status as a governmental instrumentality according to its charter, and because of its status as a subsidiary entity of the District according to Chapter 165 of the Private Acts of 1992 of the Tennessee General Assembly. Furthermore, the Chancellor concluded that HP had committed numerous violations of the Act in that it has never published or publicized any public notice of the meetings of its Board of Directors. Finding such, the Chancellor declared, as required by statute, all actions of HP's Board of Directors void and of no effect. Thus, the action of HP's Board of Directors in terminating Souder's contract was declared void and of no effect, and the Chancellor declared the PPA between Souder and HP still in effect. In addition, the Chancellor issued an injunction enjoining HP from further violations of the Act.[6]

HP perfected the present appeal, and presents the following issues, as stated in its brief, for our review:

> 1. Whether it was error for the chancery court to fail to compel the Plaintiff to submit his claim against the Defendant to arbitration.
>
> 2. Whether it was error for the chancery court to grant the Plaintiff a judgment on the pleadings on the applicability of the Open Meetings Act.
>
> 3. Whether it was error for the chancery court to find that the Open Meetings Act applied to Health Partners.
>
> 4. Whether it was error for the chancery court to find that the termination of the Plaintiff's contract with Health Partners was an action of Health Partners' Board of Directors.
>
> 5. Whether it was error for the chancery court not to find that any violation of the Open Meetings Act that might have occurred was cured by action of the Board of Trustees of the District.
>
> 6. Whether the scope of the injunction entered by the chancery

---

[6] The Chancellor also concluded that HP's assertion that the subsequent action of the Board of Trustees cured any violation of the Act to constitute a conclusion of law. As such, the Chancellor stated that such a conclusion of law is not effective to establish a disputed issue of fact on the basis of the pleadings in order to avoid entry of a judgment on the pleadings. Furthermore, the Chancellor rejected HP's claim that the decision to terminate Souder's Physician Provider Agreement was purely a management decision made without reference to the resolution of the Board of Directors as a legally impossible fact.

court is impermissibly broad.

## Standard of Review

It appears from an examination of the Chancellor's Conclusions of Law, that he relied on matters outside the pleadings. "When matters outside the pleadings are presented to and considered by the court, the motion is treated as a motion for summary judgment under Rule 56. . . ." 3 Nancy F. MacLean and Bradley A. MacLean, *Tennessee Practice* §12.12, p. 191 (2d ed. 1989). Generally, a motion for summary judgment allows the non-moving party time to present a defense, Tenn. R. Civ. P. 56.03, but HP makes no complaint that it was denied extra time. Thus, Souder's motion will be treated as a summary judgment motion.

A motion for summary judgment should be granted when the movant demonstrates that there are no genuine issues of material fact and that the moving party is entitled to a judgment as a matter of law. Tenn. R. Civ. P. 56.04. The party moving for summary judgment bears the burden of demonstrating that no genuine issue of material fact exists. *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997). On a motion for summary judgment, the court must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence. *Id.* In *Byrd v. Hall*, 847 S.W.2d 208 (Tenn. 1993), our Supreme Court stated:

> Once it is shown by the moving party that there is no genuine issue of material fact, the nonmoving party must then demonstrate, by affidavits or discovery materials, that there is a genuine, material fact dispute to warrant a trial. In this regard, Rule 56.05 provides that the nonmoving party cannot simply rely upon his pleadings but must set forth *specific facts* showing that there is a genuine issue of material fact for trial.

*Id.* at 211 (citations omitted) (emphasis in original).

Summary judgment is only appropriate when the facts and the legal conclusions drawn from the facts reasonably permit only one conclusion. *Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn. 1995). Since only questions of law are involved, there is no presumption of correctness regarding a trial court's grant of summary judgment. *Bain*, 936 S.W.2d at 622. Therefore, our review of the trial court's grant of summary judgment is *de novo* on the record before this Court. *Warren v. Estate of Kirk*, 954 S.W.2d 722, 723 (Tenn. 1997).

## Arbitration

HP contends that the Chancellor erred by not compelling Souder to submit his claim to arbitration. HP

premises this contention upon a provision in the PPA which provides that any controversy, dispute or disagreement arising out of or relating to the PPA be submitted to arbitration. HP further contends that such a clause mandating arbitration requires this Court to submit a dispute over the violation of the Act to arbitration.

We note that Souder's complaint does not present issues dealing with the terms and provisions of his contract with HP. To the contrary, the contention in his complaint is that HP's action in curtailing the provider network was taken in violation of the Act. Such a complaint is outside of the ambit of Souder's contract and deals with an extraneous matter that is not properly a subject for arbitration. In *City of Blaine v. John Coleman Hays & Assoc., Inc.,* 818 S.W.2d 33 (Tenn. App. 1991), this Court held that an arbitration clause in a contract was not applicable in determining whether a contracting party was fraudulently induced to enter into the contract. We determined that inducement to enter into the contract was not within the purview of the contract itself. Therefore, the arbitration clause was not applicable. Although the case at bar is not factually the same as *City of Blaine*, we do have an analogous situation in that Souder's complaint deals with a matter that is not within the purview of the contract but rather that HP's manner of dealing with the contract was illegal because of the violation of the Act. The trial court did not err in denying HP's motion to submit this matter to arbitration.

## Judgment on the Pleadings

In the second issue presented to this Court, HP contends that it was error for the Chancellor to grant Souder a judgment on the pleadings. As we explained earlier, the Chancellor relied on matters outside the pleadings.[7] This reliance converted the motion for judgment on the pleadings to a motion for summary judgment and renders HP's assertions moot.

## Open Meetings Act

In the third and most complex issue, HP contends that the Act does not apply because its Board of Directors is not a "governing body" as defined by statute and case law. We respectfully disagree.

The legislature has declared that it is the policy of this state that "the formation of public policy and decisions is public business and shall not be conducted in secret." T.C.A. § 8-44-101(a) (1993). Public knowledge of the manner in which government decisions are made by public officials is an essential element of a democratic government. *Metropolitan Air Research Testing Auth., Inc. (MARTA) v. Metropolitan Gov't*, 842 S.W.2d 611, 616 (Tenn. App. 1992). In order to provide openness in government, the legislature passed the Open Meetings Act. The Act, in pertinent part, provides:

---

[7] The Chancellor relied on Exhibit A of Michael Grafton's affidavit in rendering his decision.

**Open meetings - "Governing body" defined - "Meeting" defined. -**
(a) All meetings of any governing body are declared to be public meetings open to the public at all times, except as provided by the Constitution of Tennessee.
(b)(1) "Governing body" means:
(A) The members of any public body which consists of two (2) or more members, with the authority to make decisions for or recommendations to a public body on policy or administration. . . .

T.C.A. § 8-44-102 (1993 & Supp. 1998).

The Act is remedial in nature. *Dorrier v. Dark*, 537 S.W.2d 888, 891 (Tenn. 1976); *Memphis Publ'g Co. v. City of Memphis*, 513 S.W.2d 511, 513 (Tenn. 1974). "It should, therefore, be construed broadly to promote openness and accountability in government, . . . and to protect the public against closed door meetings at every stage of a government body's deliberation." *MARTA*, 842 S.W.2d at 616 (citations omitted). Further, "[t]he [A]ct is to be construed most favorably to the public and is all encompassing and applies to every meeting of a governing body except where the statute, on its face, excludes its application." *State v. Shelby County Bd. of Comm'rs*, 1990 WL 29276, at *4 (Tenn. App. W.S. March 21, 1990). To that end, the Act requires public notice of all regular or special meetings of a governmental body. T.C.A. § 8-44-103 (1993). Furthermore, secret votes are prohibited, and minutes of the meeting are required. T.C.A. § 8-44-104 (1993). In the event that these requirements are not met, "[a]ny action taken at a meeting in violation of this part shall be void and of no effect." T.C.A. § 8-44-105 (1993).

The issue before us is one of first impression. The term "public body" as used in the above statute, was not defined. Therefore, we must first determine whether the General Assembly intended that a PPO's board of directors fall within the coverage of a "governing body." *See Mid-South Publ'g Co. v. Tennessee State Univ. & Community College Sys. Bd. of Regents*, No. 01-A-01-9002CH00074, 1990 WL 207410 (Tenn. App. M.S. Dec. 19, 1990).

The groundwork for determining what constitutes a "governing body" for the purposes of the Act is found in the case of *Dorrier v. Dark*, 537 S.W.2d 888 (Tenn. 1976). James Dark was a teacher with the Davidson County school system when the local school board brought "neglect of duty and conduct unbecoming a teacher" charges against him. After a hearing in front of the Metropolitan Board of Education, Dark was terminated. Dark challenged the decision in court and "asserted that the Board's action was void because it was 'formulated' in a closed session in violation. . . of the Open Meetings Act." *Id.* at 889.

The Supreme Court discussed the Act in depth and attempted to clarify T.C.A. § 8-44-102. After careful consideration, the court concluded that the term "public body" should be broadly interpreted. The Court noted that the term "public body" as used in T.C.A. § 8-44-102 was not an uncertain term. The Court stated:

> It is clear that for the purpose of this Act, the Legislature intended to include any board, commission, committee, agency, authority or any other body, by whatever name, whose origin and authority may be traced to State, City or County legislative action and whose members have authority to make decisions or recommendations on policy or administration affecting the conduct of the business of the people in the governmental sector.

*Id.* at 892.

While *Dorrier* provides insight into the Act, it does not address the particular issue before this court. The case of *Northwest Georgia Health Sys., Inc. v. Times-Journal, Inc.*, 461 S.E.2d 297 (Ga. App. 1995) is instructive on this issue. There, the Marietta Daily Journal filed suit alleging that the Northwest Georgia Health System, Inc. and Promina Health System, Inc. violated the Georgia Open Meetings Act by refusing to hold public meetings. *Id.* at 298.

Promina was the sole member of Northwest Georgia Health Systems. Northwest was a "private, nonprofit Georgia corporation . . . organized 'for the benefit of, to perform the functions of, or to carry out the purposes of'" several local county hospitals. Promina characterized itself as a holding company and parent corporation of Northwest. Further, Northwest's board of trustees were nominated by Northwest's board and approved by Promina's board. Finally, the only tax dollars Northwest received were county funds reimbursing Northwest for providing indigent care. These reimbursements amounted to less than two (2) percent of Northwest's revenues. *Id.* at 298-99.

The Georgia Court of Appeals held that Northwest was a public agency because its "subsidiary hospital corporations contractually agreed to operate public hospital authority assets for the public good and Northwest's statement of corporate purpose is (in part) to operate those assets for the benefit . . . of public hospital authorities." *Id.* at 300. Citing the Georgia Supreme Court,[8] the court of appeals stated "that an entity to which a public agency had delegated its official responsibilities and authority was the vehicle by which the agency carried out its responsibilities and . . . was subject to the Open Meetings Act." *Id.* Finally, the court concluded:

> Without question, these private, nonprofit corporations became the vehicle through which the public hospital authorities carried out their official responsibilities. Consequently, despite the private, nonprofit status of defendants Northwest and Promina and their subsidiary hospital corporations, the trial court in the case sub judice was authorized to conclude on the facts before it that Northwest and Promina, as vehicles for public agencies, were subject to the [Open Meetings] Act . . . .

---

[8] The court relied heavily on the Georgia Supreme Court's decision in *Red & Black Publ'g Co. v. Board of Regents*, 427 S.E.2d 257 (1993). In that case, the Court held that the Student Organization Court of the University of Georgia was subject to the Open Meetings Act because a public agency had delegated official responsibilities and authority to the Student Organization Court. Thus, a subsidiary of a public agency was deemed subject to the Open Meetings Act.

*Id.* (citation omitted).

In addition to the foregoing case, the case of ***Finister v. Humboldt Gen. Hosp., Inc.***, 970 S.W.2d 435 (Tenn. 1998) provides further insight into the issue before us. In *Finister*, Mary Finister filed suit seeking workers' compensation benefits from Humboldt General. Humboldt General claimed immunity under the Tennessee Workers' Compensation Act, T.C.A. § 50-6-106(5), which states: "[t]he Workers' Compensation Act shall not apply to . . . [t]he state of Tennessee, counties thereof and municipal corporations."

Humboldt General and HP occupy identical positions in relation to the District. Humboldt General, like HP, is a creation of the Jackson-Madison County Hospital District. It was organized in 1991, and the District is its sole member. In defense to Finister's workers' compensation claim, Humboldt General "argued that it is a subsidiary of the exempt Hospital District and as a result, it is also exempt from the Workers [sic] Compensation Laws." *Id.* at 437. Finister argued that neither the District nor Humboldt General were exempt.

The Court determined that the District was not covered by the Workers' Compensation Act. Relying on ***Johnson v. Chattanooga-Hamilton County Hosp. Auth.***, 749 S.W.2d 36 (Tenn. 1988), the Court found that "a legislatively created non-profit Hospital District which acts on behalf of a governmental entity and which performs a governmental function is a 'municipal corporation' within the meaning of the statutory exemption provision." *Finister*, 970 S.W.2d at 438. The Court found that the District intended to and does "act on behalf of and for the benefit of Madison County and the City of Jackson." The Court held that the District was a municipal corporation and exempt from workers' compensation under the statute. *Id.* at 439. The Court concluded that a subsidiary of a municipal corporation is, in essence, "a division or department of the State or county or municipal corporation," and the statutory exemption applied to such divisions and departments. *Id.* Several factors convinced the Court that Humboldt General was, in fact, a subsidiary of the District. First, the Court noted that the District organized Humboldt General as a non-profit, public benefit corporation. Second, the Board of Trustees of Humboldt General and the District were identical. Third, the board members received no compensation and were selected by county and city officials. Fourth, none of Humboldt General's net earnings were distributed to any private person or entity. Fifth, upon dissolution, the District would receive any net assets. In addition to the foregoing, the Court found two factors very persuasive. First, the Tennessee General Assembly has provided:

> The mission and purpose of the Jackson-Madison County General Hospital District shall be for the benefit of the City of Jackson, Tennessee and Madison County, Tennessee, to provide, on a fee-for-service basis with due regard for the needs of low-income and indigent patients, the full range of health care. . . . *Each nonprofit corporation of which such hospital district is the sole member existing when this amendment becomes law or thereafter created, shall be deemed a subsidiary entity of such*

9

*hospital district created by this act* and shall be a governmental entity for purposes of the Tennessee Governmental Tort Liability Act. . . .

Chapter 165, Private Acts of 1992 (emphasis added). Secondly, Humboldt General's corporate charter empowers it to: "furnish affordable and more accessible healthcare and services to the citizens of the City of Jackson and Madison County as 'a governmental instrumentality for the exclusive benefit of the Jackson-Madison County Hospital District.' " *Finister,* 970 S.W.2d at 439-40.

*Finister* was concerned with the application of the workers' compensation law and the exemption afforded to, among others, municipal corporations. However, we believe that if the District is a municipal corporation for the purposes of the workers' compensation law, it is also a municipal corporation and a public body as referred to in T.C.A. § 8-44-102 (1993 & Supp. 1998). Furthermore, the similarities of HP in the instant case and Humboldt General in the *Finister* case are readily apparent. HP is a nonprofit corporation with the District as its only member, and is deemed a subsidiary entity of the District by Chapter 165, Private Acts 1992. The corporate charter of HP clearly states that it was created as "a government instrumentality of the Jackson-Madison County General Hospital District." HP's existence is premised on the idea that it will further "the statutory mission of the [District] to make quality health care available to the public at reasonable costs."

Other factors are also pertinent. HP commingled funds with the District, and HP even allowed its funds and bookkeeping to be handled by the accounting department of the District. HP funds were deposited and invested in the same manner as funds of the District. Furthermore, the District appointed the members of HP's Board, and these members received no compensation. Finally, in or around 1992, the District gave HP $400,000 in seed capital and extended a $500,000 line of credit.

After examining all the relevant factors, we find that HP is a subsidiary of the District. A subsidiary of an exempt municipal corporation like the District is "comparable to a division or department of the State or county." *See Finister*, 970 S.W.2d at 439. We agree with the Georgia Court of Appeals reasoning in *Times-Journal* and hold that subsidiaries to which municipal corporations have delegated their official responsibilities and authority are subject to the Open Meetings Act. *See Northwest Georgia Health Sys. v. Times-Journal, Inc.*, 461 S.E.2d 297 (Ga. App. 1995). With the foregoing, we conclude that HP is subject to the provisions and requirements of the Act, and the meeting of its governing body are public meetings. T.C.A. § 8-44-102 (1993 & Supp. 1998).

### Decision of the Board of Directors or of Management

Next, HP asserts that even if the Act is applicable, Souder cannot claim that the PPA was terminated in violation of the Act because the actual decision to terminate the PPA was independently made by HP's management,

not its Board of Directors. HP contends that the PPA contained a provision that allowed either party to terminate the agreement with or without cause, and that such provision was exercised by HP's management in a letter to Souder dated January 31, 1997 notifying him that the PPA was terminated pursuant to the provision in the PPA allowing such.

HP's contention that this was a management decision is without merit. From the facts in the record, it is obvious that the decision to limit the network thereby terminating Souder's PPA, in addition to the contracts of other physicians, was made by HP's Board of Directors. In the letter sent to Souder from HP dated November 26, 1996, it is stated that "[t]he board of directors of Health Partners recently approved actions which offer an exclusive provider relationship to the West Tennessee Alliance for Healthcare." The letter continues by stating that "[b]ecause of the above described decision, we are hereby notifying you that your existing contract with Health Partners will not be renewed." This letter refers to action taken by the Board of Directors through a written consent resolution to limit HP's network. Furthermore, on January 9, 1997, the Board of Directors of HP adopted a resolution in which it restated the above policy of limiting HP's network in Madison County. In addition to the November 26, 1996 letter and the January 9, 1997 resolution, an affidavit, of Michael Grafton, Vice President for Fiscal Affairs and Chief Financial Officer of the District, stated that the Board of Directors of HP made the decision to limit its network.

In consideration of the foregoing items, it appears to this Court that the decision to limit HP's network thereby requiring the termination of Souder's PPA was made by the Board of Directors of HP. The contention of HP that this was a management decision is untenable in the face of the facts presented. Thus, we agree with the Chancellor in his conclusion that the "actions referenced in the January 31, 1997 letter . . . make it clear that the termination of the physician participation agreement was entirely consistent with, and was required by, the action of the board of directors of Health Partners, Inc."

### Ratification

HP further asserts that if it is subject to the Act and that the action of the Board of Directors resulted in the termination of Souder's PPA, Souder has no basis for relief because any violation of the Act has been cured by the subsequent ratification of all actions of HP's Board of Directors by the Board of Trustees of the District in a meeting held in compliance with the Act.

As previously stated, T.C.A. § 8-44-105 provides that "[a]ny action taken at a meeting in violation of [the Act] shall be void and of no effect." However, it was not the intent of the legislature to forever bar a governing body from ratifying a prior decision made in violation of the Act. *Neese v. Paris Special Sch. Dist.*, 813 S.W.2d 432, 436 (Tenn. App. 1990). On the other hand, it was not the intent of the legislature to allow a governing body to ratify a decision in a subsequent meeting by a "perfunctory crystallization" of its previous action. *Id.*

11

Rather, "the purpose of the act is satisfied if the ultimate decision is made in accordance with the [Act], and if it is a new and substantial reconsideration of the issues involved, in which the public is afforded ample opportunity to know the facts and to be heard with reference to the matters at issue." *Id.*

Conceding that the action of the Board of Directors could have been ratified through the subsequent action of the Board of Trustees, Souder asserts that the July 29, 1997 meeting of the Board of Trustees of the District failed to cure any previous violation of the Act in that notice of the meeting was not in compliance with the provisions of the Act. Souder contends that the notice failed to mention any content of the meeting and failed to give the public any notice of what issues would be discussed at such meeting. Thus, since notice of the meeting was defective, the action of the Board of Trustees failed to comply with the Act thereby rendering such action void and of no effect.

T.C.A. § 8-44-103 provides that "adequate public notice" must be given of meetings by the governmental body holding such meetings be it a regular or special meeting. In considering the phrase "adequate public notice," the Tennessee Supreme Court has observed:

> We think it is impossible to formulate a general rule in regard to what the phrase "adequate public notice" means. However, . . . adequate public notice means adequate public notice under the circumstances, or such notice based on the totality of the circumstances as would fairly inform the public.

*Memphis Publ'g Co. v. City of Memphis*, 513 S.W.2d 511, 513 (Tenn. 1974).

Thus, the circumstances of each case must be taken into account in order to determine the adequacy of the notice given.

According to the facts as presented in the record, the Board of Trustees of the District held a meeting on July 29, 1997, in which the Board of Trustees amended the charter of HP making the Board of Trustees of the District the Board of Trustees of HP. Furthermore, the Board of Trustees ratified and confirmed all actions of the previous Board of Directors of HP and the management of HP "including without limitation the letting and termination of contracts of all kinds." The Board of Trustees announced this meeting to the public by mailing notice of the meeting to the local newspaper, local radio stations, and the local television station approximately eight days before the meeting was held. According to Souder's brief, the notice of the meeting, which Souder contends does not constitute adequate public notice, stated, "[t]he board of trustees of West Tennessee Healthcare will meet in the city-county conference of Jackson-Madison County General Hospital at 5:00 p.m. on Tuesday, _____."[9]

While the Act requires all meetings of entities subject to the Act be open to the public, it does not guarantee all citizens the right to participate in the meetings. *Whittemore v. Brentwood Planning Comm'n*, 835

---

[9] The record was deficient with regard to a copy of the notice of the July 29, 1997 meeting of the Board of Trustees of the District.

S.W.2d 11, 18 (Tenn. App. 1992).

> [T]he notice required by Tenn. Code Ann. § 8-44-103 is sufficient as long as it gives interested citizens a reasonable opportunity to exercise their right to be present at a governing body's meeting. The notice need not invite public participation in a public meeting in order to satisfy the [Act's] requirements.

*State ex rel. Akin v. Town of Kingston Springs*, No. 01-A-01-9209-CH00360, 1993 WL 339305, at *5 (Tenn. App. M.S. Sept. 8, 1993).

In view of the totality of the circumstances, the notice of the meeting comports with the provisions of the Act. Notice was given to the media in order to notify the public of the meeting. The notice provided the public with a reasonable opportunity to be present at the meeting. In fact, according to the minutes of the meeting, members of the media and the public were in attendance at the meeting. Furthermore, while Souder protests the contents of the notice in not referring to the proposed action of limiting the physician network, the meeting was not limited to this sole subject. The agenda of the meeting presented several different areas regarding the business of the District. Thus, failing to specifically state in the notice the issue concerning HP did not make the notice inadequate in light of the several purposes of the meeting. We are of the opinion that notice was given which "would fairly inform the public" under the circumstances.

While the notice may comport with the Act, we find that the ratification and confirmation of all actions of the Board of Directors of HP by the Board of Trustees of the District was merely a perfunctory rubberstamp thereby failing to cure the previous violations of the Act. According to the minutes of the July 29, 1997 meeting, the only resolution pertaining to HP that was raised during the meeting in discussion was the establishment of the Board of Trustees of the District as the Board for HP. The minutes state that "Mr. Moss explained to the Board the purpose of reorganizing Health Partners which will establish the District's Board of Trustees as the Board for Health Partners as outlined in the resolution presented. Dr. Newell made a motion to approve, seconded by Mr. Mansfield and the Board unanimously approved."

There was no discussion by the Board of Trustees pertaining to the limitation of HP's physician network previously adopted by the Board of Directors of HP. As previously stated, the adopted resolution of the Board of Trustees merely states that all actions of the Board of Directors of HP are ratified and confirmed including the termination of all contracts. Since there was no discussion of the matter of limiting the network and the only mention of such is the adopted resolution of which there is no evidence of any discussion on the matter, the action of the Board of Trustees is merely a "perfunctory crystallization" of the decision made by the Board of Directors.

In that the Board of Trustees failed to give "new and substantial reconsideration" of the actions taken by the

13

Board of Directors, the action of the Board of Trustees was a subterfuge and nothing more than a mere ratification of the previous actions taken in contravention of the Act. As such, the actions of the Board of Trustees did not cure the previous violations of the Act by the Board of Directors. Therefore, the action by the Board of Directors is void and of no effect and remains such since it was not cured by the actions of the Board of Trustees.

### Injunction

The Final Judgment and Injunction of the Chancellor provides in pertinent part:

> 4. Prior to any action taken by the current board of Health Partners, Inc. against the contractual interests of Dr. Souder to be effective, Health Partners, Inc., because of its history of ignoring the clear requirements of the Open Meetings Act, must establish, to the satisfaction of this Court, that such actions were taken in full compliance with the requirements of the Open Meetings Act. Until such a determination occurs, all preferred provider agreements between Health Partners, Inc. and any participating provider shall remain in effect until they expire by operation of their own terms.

> 5. This Court shall retain jurisdiction over the parties hereto, and Health Partners, Inc. shall report to this Court in writing every six months for a period of one year from the date of the entry of this Order with regard to the fact of its compliance of the Open Meetings Act. . . . Health Partners, Inc. is hereby restrained from violating any of the requirements of the Open Meetings Act. . . .

HP claims that the injunction is impermissibly broad in that it went further than necessary to grant Souder relief, the only plaintiff before the court. HP contends that the Chancellor overstepped his jurisdiction by granting such a broad injunction despite the fact that Souder never took steps to have the case certified as a class action. Furthermore, HP asserts that there is nothing in the record to indicate that other physicians whose PPAs were terminated have any desire to remain members of HP. In addition, HP contends that the injunction is internally inconsistent in that it declares all actions ever taken by HP's Board of Directors null and void thereby voiding all PPAs entered into by HP while simultaneously requiring that all PPAs remain in effect.

T.C.A. § 8-44-106 provides in pertinent part:

> (a) The circuit courts, chancery courts, and other courts which have equity jurisdiction, have jurisdiction to issue injunctions, impose penalties, and otherwise enforce the purposes of [the Act] upon application of any citizen of this state.
>
> * * *
>
> (c) The court shall permanently enjoin any person adjudged by it in violation of [the Act] from further violation of [the Act]. Each separate occurrence of such meetings not held in accordance with this part constitutes a separate violation.

> (d) The final judgment or decree in each suit shall state that the court retains jurisdiction over the parties and subject matter for a period of one (1) year from date of entry, and the court shall order the defendants to report in writing semiannually to the court of their compliance with [the Act].

We agree with the Chancellor in Paragraph 5 of the above-quoted portion of the injunction. This section is in keeping with the provisions of T.C.A. § 8-44-106(c)-(d). On the other hand, Paragraph 4 of the above-quoted portion

14

is unduly broad in its reach. Souder was the only plaintiff before the Chancellor. As such, the injunction affecting all preferred provider agreements is impermissibly broad because it goes well beyond what is necessary to afford Souder relief as the only plaintiff involved in the lawsuit. Furthermore, Paragraph 4 is questionable in that it states that "[p]rior to any action taken… Health Partners, Inc.… must establish… that such actions were taken in full compliance" with the Act. This paragraph is unworkable and unnecessary. Paragraph 5 provides the proper mechanism for assuring compliance with the Act in the form of a contempt action if the Act is violated by HP in the future.

We construe the judgment to permanently enjoin HP from further violations of the Act as required by T.C.A. § 8-44-106(c). Therefore, the judgment shall be modified to eliminate Paragraph 4. Thus, HP is enjoined from violating any of the requirements of the Act and shall report to the Chancellor as provided for in Paragraph 5.

## Conclusion

The judgment of the Chancellor, as modified in regard to the injunction, is affirmed, and the case is remanded for such further proceedings as necessary. Costs of appeal are assessed against the appellants.

_____
**W. FRANK CRAWFORD,**
**PRESIDING JUDGE, W.S.**

**CONCUR:**

_____
**ALAN E. HIGHERS, JUDGE**

_____
**HERSCHEL P. FRANKS, JUDGE**